UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Debbie Lou Batta,                                    Civil No. 11-293 (SRN/LIB)

        Plaintiff,

v.                                                   **REPORT AND RECOMMENDATION**

Michael J. ASTRUE, Commissioner of the
Social Security Administration,

        Defendant,

---

     Debbie Batta (Plaintiff) seeks judicial review of the decision of the Commissioner of

Social Security (Defendant) denying her application for disability insurance benefits (DIB) and

supplemental security income (SSI).  The matter was referred to the undersigned United States

Magistrate Judge for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule

72.1.  This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Both parties submitted motions for summary judgment.  For the reasons set forth below, the

Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's

motion for summary judgment be granted.

### I.    BACKGROUND

#### A.  Procedural History

     Plaintiff filed her application for DIB and Title XVI application for SSI on June 16, 2006,

alleging a disability onset date of September 18, 2004.  (Tr. 93-99).[1]  Her application was denied

initially and upon reconsideration.  (Tr. 43-48, 55-60).  Upon Plaintiff's request for a hearing,

Administrative Law Judge David Gatto (ALJ) held a hearing on May 28, 2008.  (Tr. 27).  The

---

[1] Throughout this Report and Recommendation, this Court refers to the administrative record [Docket No. 7] for the
present case by the abbreviation "Tr."

ALJ denied Plaintiff's claim on December 1, 2008.  (Tr. 16).  The ALJ found that from

September 18, 2004 through the date of the ALJ's decision, Plaintiff was not disabled within the

meaning of the Social Security Act.  (Tr. 8).  Plaintiff sought review of the decision by the ALJ

and the Appeals Council denied the request.  (Tr. 1-4).  However, the Appeals Council

supplemented the record with "[t]reatment notes . . . dated March 30, 2008 through October 30,

2008."  (Tr. 4).  Because the Appeals Council denied Plaintiff's request for review, the ALJ's

decision became the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

**B.  Factual History**

Plaintiff was 53 years old at the time that she filed her claim.  (See Tr. 93).  She is a high

school graduate and spent two years at a college after graduating from high school.  (Tr. 31).

Prior to her alleged disability, she was employed as a cafeteria manager and cash office manager.

(Tr. 115).  She provides that she stopped working in 2001 to take care of her mother-in-law, who

at the time was terminally ill, and then in 2004, she asserts that she became disabled when she

began to have heart problems.  (Tr. 31-32).

At the hearing, Plaintiff stated that she is unable to work because of a combination of

physical and mental health conditions that include her heart problems, back problems, and

depression.  (Tr. 32-36).  She alleged at the hearing that as a result of these impairments and her

medications, it is very difficult for her to get comfortable and that she has nerve pain in her legs

and lower back.  (Tr. 32).  She stated that her depression, which she first began treating in March

of 2008 (only months before the ALJ hearing) was her "biggest problem."  (Tr. 32).  She also

provided at the hearing that although many of these problems existed for several years, she was

not always able to treat them as much as she would like because of financial limitations.  (Tr. 32-

33).  Furthermore, she testified that most of her medications make her dizzy and tired, which requires her to "nap every morning."  (Tr. 36).

Despite her mental and physical conditions, she admits that she is capable of doing some things by herself.  She is able to walk the one or two flights of stairs in her apartment building on a regular basis.  (Tr. 248).  She is able to cook, wash dishes, and vacuum, though she trades off with her husband.  (Tr. 32).  She also spends a lot of time with her three-and-a-half year old granddaughter, who keeps her busy.  (Tr. 34).

### C.  Medical Evidence in the Record Considered by the ALJ

The medical records beginning in September of 2004 (her alleged disability onset date), demonstrate that Plaintiff at that time was suffering from chest pains and heart issues, which she described as having "a baseball in her chest."  (Tr. 162).  On September 18, 2004, she reported to the emergency room with chest pains that had been worsening over a week.  (Tr. 172).  An EKG showed characteristics of an inferior myocardial infarction, which was later confirmed.  (Tr. 166-67).  After an operation to dilate and stent her right coronary artery, the attending physician noted that she was doing well.  (Tr. 166-67).  On September 20, 2004, it was again reported that she had done well after the operation and that she completed the rehab at the hospital.  (Tr. 174).  In light of her condition and operation, she was diagnosed with acute coronary syndrome.  (Tr. 173).  On September 21, 2004, on a follow-up visit, Plaintiff reported that she did not experience any chest pain, fever, nausea, headache, visual changes, or dizziness since being released.  (Tr. 194).  The reporting physician noted that she appeared well and her affect was normal.  (Tr. 194).

In December of 2004, on a follow-up visit, Plaintiff reported that she had no chest discomfort but experienced some pain in her back.  (Tr. 237).  The physician did not believe that

her back pain was related to her heart, and did not pursue an MRI, though she noticed "some pinpoint tenderness along the spine." (Tr. 238). Subsequently, on December 13, 2004, Plaintiff visited John E. Bassett, M.D., who adjusted Plaintiff's medication and advised her to seek further treatment for back pain if acetaminophen did not relieve it. (Tr. 233). At the time, Plaintiff reported that she had been exercising and walking outside. (Tr. 233). On December 31, 2004, during a visit to the emergency department, Plaintiff complained of back pain and chest pain. (Tr. 206). She reported that she experienced similar symptoms as at the time of her myocardial infarction, though this time the symptoms resolved within one-half hour. (Tr. 206). In regard to her chest pain, a CT scan was negative for "pulmonary embolus or aortic dissection," but she was admitted and treated with cardiac medications. (Tr. 207). An electrocardiogram showed that her sinus rhythm was normal and unchanged from September. (Tr. 211). In regard to her back pain, because her pain syndrome was "stable," an MRI was performed and she was given pain medication. (Tr. 208, 211). It was later determined that her chest pain most likely arose because "she had been off of [her medication] for a while." (Tr. 230). On January 5, 2005, Plaintiff underwent a physical stress test for four minutes, during which she experienced no chest discomfort and Dr. Bassett noted that it showed "no left ventricular enlargement, no wall motion abnormalities, a small fixed defect in the inferior wall, a measured ejection fraction of 69% and no reversible myocardial ischemia." (Tr. 244). The test was terminated because of fatigue. (Tr. 243).

In June of 2005, she again visited a hospital for chest pains. (Tr. 223). At the time of examination, the physician noted that her chest x-ray did not show any signs of heart failure and Plaintiff was pain-free at the time. (Tr. 224). As such, she was released and advised to continue her medications. (Tr. 224). The next day, on a follow-up visit with Plaintiff, Dr. Bassett noted

that a single nitroglycerin relieved Plaintiff's pain and he was "not quite sure why she then felt she needed to come to the hospital." (Tr. 225). He also noted that her enzymes and electrocardiograms are normal. (Tr. 225). Dr. Bassett concluded that she "need not be hospitalized further or undergo stress test," rather he advised her to continue taking her medication. (Tr. 227). On June 27, 2005, she again visited Dr. Bassett reporting similar symptoms, and Dr. Bassett again released her on symptomatic treatment. (Tr. 231).

In April of 2006, she reported that she was suffering from a headache, heavy breathing, and hypertension. (Tr. 269). She also advised the physician that for the three months prior to that she was unable to take her prescribed medications because of financial constraints. (Tr. 269). The physician refilled her pain medication. (Tr. 269).

On June 23, 2006, Plaintiff visited the emergency room with reports of intermittent chest pain. (Tr. 246). Although her medication usually resolved her chest pain, and at the time of the visit she had no pain, she went to the ER to "get checked." (Tr. 246). She was treated with four baby aspirin, saline lock, nitroglycerin, and Lovenox. (Tr. 247). The treating physician, David Beddow, M.D., noted that Plaintiff was "an alert, comfortable-appearing woman, who appears to be in no distress." (Tr. 248). Her chest x-ray showed that the "cardiac silhouette and pulmonary vasculature are within normal limits" and that the "lungs are clear without evidence of consolidation or effusion." (Tr. 252). A physical stress test on the next day, which she performed for five minutes and fourteen seconds, revealed that her heart rate response was normal, overall her response to the exercise was normal, and she developed no symptoms as a result of the test. (Tr. 257). The test "revealed normal LV function at rest and post exercise," "no wall motion abnormalities," and no "echo signs of ischemia." (Tr. 257). The test was terminated because she reached the target heart rate, rather than fatigue, which was the case in

the last stress test in 2005.  (Tr. 257).  On June 28, 2006, she made a visit to a different physician and reported chest pains.  (Tr. 267).  She also advised the physician that she was under financial constraints and had a difficult time affording her medication.  (Tr. 267).  The physician prescribed some different medication and released Plaintiff.  (Tr. 267).

On July 20, 2006, state agency medical consultant Dan Larson, M.D. performed a physical residual functional capacity assessment on Plaintiff.  (Tr. 279-86).  His primary diagnosis was ischemic heart disease.  (Tr. 279).  Under exertional limitations, Dr. Larson found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull without limitation.  (Tr. 280).  Under postural limitations, he noted that Plaintiff could frequently climb stairs or ramps, balance, stoop, kneel, crouch, and crawl and could occasionally climb ladders, ropes or scaffolds.  (Tr. 281).  Dr. Larson noted no manipulative limitations such as reaching, handling, fingering, or feeling, noted no visual limitations, communicative limitations, or environmental limitations.  (Tr. 282).  On October 12, 2006, state agency medical consultant Aaron Mark, M.D. reaffirmed Dr. Larson's assessment. (Tr. 300).

In November of 2006, Plaintiff made a visit to Dr. Richard B. Freese, M.D. because of her hypertension.  (Tr. 351).  Plaintiff reported no chest pain, chest tightness, shortness of breath, or dyspnea on exertion.  (Tr. 351).  Dr. Freese adjusted her medication and advised her to follow-up shortly.  (Tr. 352).  On her follow-up visit, Dr. Freese diagnosed her with hypertension but noted that it was "coming under better control."  (Tr. 354).  He again adjusted her medication and advised her to follow-up in a couple of weeks.  (Tr. 354).  On the next follow-up, Dr. Freese noted that her hypertension was "under much better control on Diovan."  (Tr. 347).  During the

visit, after continued remarks regarding her application for disability over her last visits, Dr. Freese talked to her about her alleged disability.  (Tr. 347).  After informing him that she was "coming up to an administrative law judge to fight for disability," Dr. Freese reported that it was "[n]ot clear to [him] on what basis she would be finding herself disabled."  (Tr. 347).

On January 29, 2007, Plaintiff made her next follow-up visit with Dr. Freese.  (Tr. 349). Dr. Freese noted that because "her cardiovascular system [was] more or less straightened out and her blood pressure under control," he would try to address her back pain.  (Tr. 349).  She again stated that she believed she was disabled because of her back pain and that she had put in for SSD.  (Tr. 349).  Dr. Freese advised her that "there is scant record available, certainly through [his] office, that would support this."  (Tr. 349).

In March of 2007, Plaintiff made her next visit to Dr. Freese because of her back pain and neck pain.  (Tr. 342).  Dr. Freese noted that she had "clearly improved over what she had been before" and rewrote her medications.  (Tr. 343).  On April 16, 2007, she visited a different physician for her neck and back pain, asserting that her pain was getting worse.  (Tr. 344). Although Plaintiff reported that "medications are the most helpful," she stated that at the time she was "not taking any specific medications."  (Tr. 344).  Observing her x-rays of the lumbar spine from December 26, 2006, the physician reported that Plaintiff had some "narrowing and degenerative change at the L5-S1 level, [but] otherwise vertebral bodies [were] well-aligned and no other disc space narrowing" was evident.  (Tr. 345).  The x-rays of bilateral knees were "completely normal."  (Tr. 345).  Because the physician suspected degenerative disk disease of the lower lumbar spine, she prescribed Plaintiff medication and recommended that she begin physical therapy, though Plaintiff expressed concern about any such programs because of cost. (Tr. 346).

Then, on January 25, 2008, Plaintiff again visited Dr. Freese because of her back pain and neck pain. (Tr. 303). Based on an MRI, Dr. Freese noted mild degenerative changes without evidence for cord or nerve root impingement and mild nonspecific heterogeneity of bone marrow signal pattern without evidence for edema or vertebral body compression fracture. (Tr. 303). In March of 2008, upon some further testing, Dr. Freese observed improvement in Plaintiff's cholesterol levels, noted that her kidneys were good, and praised Plaintiff for her continued work to improve her health. (Tr. 306-08). On February 26, 2008, Plaintiff again complained of back pain and neck pain. (Tr. 340). Upon evaluation, she was diagnosed with degenerative disk disease of the lumbar spine and recommended steroid injections for treatment. (Tr. 340). In March of 2008, Dr. Freese noted that her "[b]lood pressure [was] under much better control," she had "no chest pain, chest tightness, shortness of breath, or dyspnea on exertion." (Tr. 328). Also in March of 2008, Plaintiff received the steroid injection recommended to her. (Tr. 367). It was noted that Plaintiff "tolerated the procedure well with no immediate complications." (Tr. 368).

In May of 2008, Plaintiff again began to experience chest pain and underwent a "substantial evaluation." (Tr. 326). There was no evidence for pulmonary emboli and she was placed on antibiotics. (Tr. 326). Her EKG and chest x-ray were also normal. (Tr. 322). All of the tests performed regarding her memory returned normal results. (Tr. 380). Then on May 23, 2008, she again visited a physician but denied any worsening pain, stated that her cough was improved and that she had not experienced any shortness of breath or wheezing. (Tr. 322). The attending physician advised her to continue with her current medications and come back for a routine follow-up in three months. (Tr. 323).

In addition to her physical impairments, beginning in March of 2008, Plaintiff began to undergo treatment for depression and anxiety. (Tr. 377). On a psychotherapy diagnostic assessment, Plaintiff reported that she felt depressed and anxious, had very little energy and decreased concentration and memory. (Tr. 377). She also provided that although she had similar feelings in the past, she was particularly stressed because this time she was not able to move past them on her own. (Tr. 377). The treating physician, Tanya Kern, M.S.W., L.I.C.S.W, found Plaintiff "alert, cooperative and casually groomed, with normal psychomotor activity and normal speech and language" and assigned her a GAF score of 55 to 60. (Tr. 377). At a visit on March 26, 2008 with Jongsok Pak, M.D., although Plaintiff believed that she suffered from depression for a number of years, she stated that in the past "she could come out of the depression without any professional help." (Tr. 332). Furthermore, although Plaintiff demonstrated improvement in her panic attacks with medication, and appeared to understand that she must continue using her medication, she didn't use them in the manner prescribed. (Tr. 333). Based on her evaluation, Dr. Pak assigned Plaintiff a GAF score of 45 to 50. (Tr. 335).

On June 9, 2008, Dr. Pak noted that Plaintiff felt "somewhat better with her depression," and that Plaintiff thought the Prozac helped her depression. (Tr. 320). Dr. Pak also observed some improvement in Plaintiff's depression and insomnia. (Tr. 321). During the visit, Plaintiff reported low concentration and tiredness as a result of some of her medication. (Tr. 320). Although she noted a depressed mood, the physician observed that Plaintiff's attention and memory "seem[ed] grossly intact upon conversation." (Tr. 321). When Dr. Pak discussed some options to alleviate her symptoms of anxiety and depression, Plaintiff stated that "[s]he was not interested in making such big changes in her meds regimen [at] this time." (Tr. 321). Rather, she preferred to "wait for the conclusion [of] her social security benefit." (Tr. 321).

### D.  Medical Evidence Submitted After the ALJ's decision

When Plaintiff submitted her request for review by the Appeals Council, she also submitted forty pages of treatment notes from March 30, 2008 to October 30, 2008, some of which were duplicates of medical notes already in the record.  (Tr. 4, 400-39).  These notes demonstrate that Plaintiff continued to make additional visits regarding her back pain, even after the ALJ hearing.

On July 10, 2008, Plaintiff made complaints of low back pain and explained that she had not noticed improvement from physical therapy or the injection she received.  (Tr. 417).  However, the treating physican reported that Plaintiff had "fairly good range of motion in her low back," could "ambulate without difficulty," had "[g]ood lower extremity strength," could walk on her tiptoes, had normal reflexes, and had a negative straight leg raising sign.  (Tr. 418).  Because Plaintiff declined physical therapy, the physician refilled her medication and advised her about "low back exercises, ice, and anti-inflammatories."  (Tr. 418).  On August 20, 2008, Plaintiff made a visit to a different physician with complaints of back pain and pain in her left leg.  (Tr. 421).  The physician observed a soft-tissue mass, more consistent with a cyst, in her left lateral hip.  (Tr. 421).  A venous duplex scan revealed a large Baker cyst, but no evidence of a clot or thrombosis.  (Tr. 422).  Though he recommended that if the pain becomes worse to return for an injection, the physician merely refilled her prescription and advised her to keep her leg elevated and use ice.  (Tr. 422-23).  Plaintiff returned on August 26, 2008 with similar pain and her medication was again adjusted and refilled, which she noted alleviated the pain.  (Tr. 424).

In September of 2008, Plaintiff made two more visits with complaints of hip and back pain.  (Tr. 427-30).  An MRI, x-rays and other tests were performed to localize Plaintiff's pain.  (Tr. 428).  The x-rays showed some mild to moderate degenerative changes in both knees and

both hips but were otherwise unremarkable and showed no acute fractures.  (Tr. 428).  The MRI

revealed no significant obvious solid or cystic mass in her left hip area.  (Tr. 429).  Nevertheless,

Plaintiff requested "something stronger for pain control" and the physician prescribed her a new

medication and referred her to orthopedics for further evaluation.  (Tr. 430).

On October 16, 2008, she visited a different physician for a "surgical second opinion

consultation regarding 'cysts on thigh.'"  (Tr. 433).  The treating physician reported that based

on her x-rays and MRI, Plaintiff had "good joint space preservation of both hip joints," and the

MRI showed "no subcutaneous tissue abnormalities" and "normal symmetric subcutaneous fat in

these areas of the markers."  (Tr. 434).  The physician advised Plaintiff that there was no need

for surgical intervention and suggested another cortisone injection and physical therapy.  (Tr.

435).  On October 30, 2008, Plaintiff made her final visit provided in the record in which she

stated that she noticed some relief of the pain down in her legs after the suggested cortisone

injection, though she still had some pain in her buttocks.  (Tr. 436).  The physician advised her to

restart her Neurontin medication and discussed pain management options with Plaintiff.  (Tr.

436).

In addition to the above medical evidence submitted to the Appeals Council, in her

motion for summary judgment to this Court, Plaintiff submitted two new letters from physicians.

(Mot. for Summ. J. [Docket No. 11] at 5-6).  The first letter, dated January 19, 2011, was written

by Rick Bosacker, M.D.  The entirety of the letter is as follows: "[Plaintiff] is under my care for

multiple issues.  She is currently not working due to restrictions related to her diagnoses.  She

currently is limited with the physical activity she can perform due to her low back pain and

coronary artery disease.  I support her application of social security disability."  (Id. at 5).  The

second letter, written by Robert J. Tierney, M.D. and dated August 2, 2010 reads:

> [Plaintiff] is a patient I have recently seen.  She has osteoarthritis, degenerative disk disease of her back.  She has an inflammatory synovitis in her knees and has osteoarthritis in the hands.  She has asked me to document this for her medical record.  Contact me if there are questions regarding these diagnoses.

(Id. at 6).

### E.  Evidence from the Vocational Expert

Vocational expert, Juletta Harren, testified at the administrative hearing regarding what jobs exist in the region and whether Plaintiff would be suitable for any such jobs.  (Tr. 36-39, 40-41).  The ALJ framed a hypothetical person and asked whether such a person could either perform Plaintiff's past relevant work or some other work available in the economy.  The hypothetical person she described was a woman between the ages of 51 and 54, with the same educational and vocational background as Plaintiff, impaired by:

> "low back pain, lumbago, diagnoses of degenerative changes to the cervical, thoracic, and lumbosacral spines, ischemic heart disease with acute inferior myocardial infarct of a status post right coronary angioplasty with stenting and diagnosis of hypertension and recent treatment for major depressive disorder recurrent, panic disorder with agoraphobia and generalized anxiety disorder."

(Tr. 37).  The ALJ also limited the hypothetical person to someone who can occasionally lift 20 pounds, frequently lift 10 pounds, and spend six out of eight hours on the feet with occasional climbing of ramps or stairs.  (Tr. 37).  The ALJ further limited the question to only jobs that would not require climbing of ropes or scaffolds.  (Tr. 37).  Ms. Harren testified that such a person could still perform Plaintiff's past relevant work.  (Tr. 57).

### F.  The ALJ's Decision

The ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 16).  In reaching his decision, the ALJ purported to apply the required five-step sequential analysis: (1) whether the claimant had engaged in substantial gainful activity; (2) whether the claimant had a severe impairment; (3) whether the claimant's impairment met or

equaled a listed impairment; (4) whether the claimant had sufficient RFC to return to her past

work; and (5) whether the claimant could do other work existing in significant numbers in the

regional or national economy.  (Tr. 9-10); 20 C.F.R. § 404.1520(a)-(f).

      At step one of the analysis, the ALJ determined that Plaintiff had not engaged in

substantial work from the onset date of her alleged disability.  (Tr. 10).  Next, in analyzing step

two, the ALJ found that Plaintiff had the following severe impairments: "coronary artery disease,

with history of stent placement, hypertension, degenerative disc and joint disease of the spine,

and chronic low back pain."  (Tr. 10).  Because there was "no continuous 12 month period in

which [Plaintiff] sought treatment for symptoms of depression and anxiety," the ALJ determined

that depression and anxiety were not severe impairments.  (Tr. 12).  At step three, the ALJ

decided that Plaintiff did not have an impairment or combination of impairments that meet or

medically equal one of the listed impairments in 20 C.F.R., part 404, subpart P, appendix 1.  (Tr.

13).

      Then, at step four of the analysis, the ALJ concluded that Plaintiff had the "residual

functional capacity [RFC] to perform light work as defined in 20 C.F.R. 404.1567(b) and

416.967(b) except that she is limited to occasionally climbing ramps and stairs, and can never

climb ropes, ladders, or scaffolds."  (Tr. 13).

      In making this RFC determination, the ALJ employed a two-step process.  (Tr. 14).  First,

the ALJ asked whether there was an underlying medically determinable physical or mental

impairment that could reasonably be expected to produce the claimant's pain or other symptoms.

(Tr. 14).  Second, if an underlying physical or mental impairment that could reasonably be

expected to produce the claimant's pain or other symptoms was shown, the ALJ evaluated the

intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to

which they limited the claimant's ability to work.  (Tr. 14).  If objective medical evidence did not substantiate the claimant's statements about intensity, persistence or symptoms, the ALJ made a finding on the credibility of Plaintiff's statements about the limiting effects of her impairments by considering the record as a whole.  (Tr. 14).  Furthermore, in making his determination, the ALJ considered all Plaintiff's alleged symptoms and whether they were consistent with the objective medical evidence and other evidence consistent with 20 C.F.R. 404.1529 and 416.929, (Tr. 14), and also considered opinion evidence in accordance with 20 C.F.R. 404.1527.  (Tr. 14).

Starting with the first prong of step four, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms.  (Tr. 14).  However, at the second prong, the ALJ determined the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC assessment.  (Tr. 14).

The ALJ found that "[t]he objective medical evidence does not entirely corroborate [Plaintiff's] subjective complaints regarding her functional limitations."  (Tr. 14).  He noted that on several occasions, Plaintiff reported that she was not suffering from chest pain, chest tightness, shortness of breath, or dyspnea on exertion, tests demonstrated only minimal degenerative changes, and doctors diagnosed Plaintiff with only mildly limited range of motion in the neck and low back.  (Tr. 14).  The ALJ also noted that although her steady work history enhanced her credibility, she had quit her last job for in order to take care of her mother-in-law, rather than because of her alleged impairments.  (Tr. 15).  Additionally, the ALJ held that Plaintiff's "testimony regarding her daily activities is also not entirely consistent with her subjective complaints regarding her functional limitations."  (Tr. 15).

In regard to opinion evidence, the ALJ considered and gave some weight to the opinion of the state agency medical consultant regarding Plaintiff's functional limitations, but did not afford it substantial weight because "it [did] not take into account any of the medical evidence after July 2006."  (Tr. 15).

Further, in step four of the analysis, the ALJ determined that Plaintiff is able to perform her past relevant work as a cafeteria manager and cash office manager because those vocations did not "require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity."  (Tr. 15).  Because the ALJ held that Plaintiff was capable of performing her past relevant work, he did not reach step five of the analysis.  As such, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 15).

## II.     STANDARD OF REVIEW

Congress imposed standards for determining whether a claimant is entitled to Social Security disability benefits.  There are several benefits programs under the Act, including the DIB Program of Title II (42 U.S.C. §§ 401 et seq.) and the SSI Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 et seq.).  "Disability" means "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be eligible for benefits, an individual's impairments must be of "such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Judicial review of the Commissioner's decision to deny disability benefits is constrained to a determination of whether the decision is supported by substantial evidence in the record as a

whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more

than a scintilla, but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir.

2009).  The substantial evidence test requires "more than a mere search of the record for

evidence supporting the [Commissioner's] findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th

Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195 1199 (8th Cir.

1987)).  Rather, the court "must take into account whatever in the record fairly detracts from its

weight."  Id.  (quoting Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 488

(1951)).

When reviewing the record for substantial evidence, the court may not reverse the

Commissioner's decision simply because substantial evidence exists to support the opposite

conclusion.  Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Moreover, the Court may

not substitute its own judgment or findings of fact for those of the ALJ.  Woolf v. Shalala, 3 F.3d

1210, 1213 (8th Cir. 1993).  The court must consider "the weight of the evidence in the record

and apply a balancing test to evidence which is contradictory."  Wilson v. Sullivan, 886 F.2d

172, 175 (8th Cir. 1989).  After balancing the evidence, if it is possible to reach two inconsistent

positions from the evidence and one of those positions represents the Commissioner's decision,

the court must affirm the decision.  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

Thus, the court will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls

within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008).

The decision of the ALJ "is not outside the 'zone of choice' simply because we might have

reached a different conclusion had we been the initial finder of fact."  Id.

### III.   DISCUSSION

Reading Plaintiff's pleadings liberally, as the Court must in light of Plaintiff's pro se status, it appears that Plaintiff argues the following on her summary judgment motion: (1) the Court should remand the case to the Commissioner for further review based on the newly submitted medical evidence; and (2) the state agency medical consultant was required to examine Plaintiff before making "life changing decisions based on medical records alone." (Mot. for Summ. J. [Docket No. 11] at 3-4).[2]  Though she does not explicitly challenge any of the ALJ's conclusions, construing her pleadings liberally, the Court now on review will incorporate the issues she raised for review before the Appeals Council.  In that light, it appears that she challenges the ALJ's determination that she was not disabled because the ALJ considered that she was able to take care of her mother and granddaughter.  (See Compl. [Docket No. 1] at 4) ("I would like the Court to review my medical records."); (Tr. 91) ("I feel Judge Gotto's reasons for denying my claim are questionable.").  She also challenges the vocational expert's conclusion that Plaintiff could still engage in her past relevant work because her previous jobs were "very exertional and stressful."  (Tr. 92).  In response to Plaintiff's arguments below and now in support of its motion for summary judgment, Defendant argues that (1) substantial evidence supports the ALJ's decision that Plaintiff was not disabled; and (2) the

---

[2] Plaintiff also states that "[t]he SSA told [her that she] could not enter medical evidence until trial."  (Mot. for Summ. J. [Docket No. 11] at 2).  However, this claim is not supported by any other factual support.  Additionally, the Court notes that later in her memorandum, she states that it was the "United States Court in Minneapolis" that told her "she could not submit evidence until trial."  Regardless of these claims, prior to the ALJ hearing Plaintiff had the opportunity to review all of the medical evidence in the record and was informed that "[b]ecause the hearing is the time to show the ALJ that the issues should be decied in [her] favor, [the Administration] need[ed] to make sure that [her] file has everything [she] want[ed] the ALJ to consider."  (Tr. 61) (Information Regarding the Hearing).  Furthermore, Plaintiff offered additional medical evidence at the ALJ hearing, in her appeal to the Appeals Council, and now in her motion before this Court.  Thus, to the extent that Plaintiff argues that she has not had the opportunity to supplement the record with what she believes is relevant medical records for the time period between September 18, 2004 and the ALJ's decision, her argument is without merit.

evidence submitted to the Court after the ALJ's decision does not undermine the ALJ's decision. (Def.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 17] at 8-14).

**A.  Whether the ALJ's Decision is Supported by Substantial Evidence in the Record as a Whole**

Plaintiff does not explicitly challenge any of the ALJ's conclusions; however, because she requested that the Court "review her medical records," and because the Court must construe her pleading liberally, by incorporating the issues she raised in her request for review to the Appeals Council, the Court understands Plaintiffs challenge to be that the ALJ improperly considered Plaintiff's daily activities in determining her RFC, specifically that she was able to take care of her mother and three-and-a-half year old granddaughter.  (See Tr. 91-92).

The Court has independently reviewed the entirety of the medical record before it and finds that the ALJ's determinations regarding Plaintiff's impairments and her RFC are supported by substantial evidence on the record as a whole.  The ALJ found that Plaintiff suffered from the following severe impairments: coronary artery disease, with history of stent placement, hypertension, degenerative disc and joint disease of the spine, and chronic low back pain.  The ALJ then found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, the ALJ also determined the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the objective medical evidence and the resulting RFC assessment.

Plaintiff appears to argue that the ALJ's determination that she is not disabled was based entirely and exclusively on his consideration that she could take care of her mother and her three-and-a-half year old granddaughter.  However, the thoroughness and breadth of the ALJ's opinion

contradicts such an argument.  The ALJ specifically stated the he made his residual functional capacity determination "[a]fter careful consideration of the entire record."  (Tr. 13). Furthermore, the ALJ provided that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," her work history, opinion evidence, and testimony regarding her daily activities. Thus, his consideration of her daily activities, which included her ability to take care of her mother and granddaughter, was only one of the factors considered which resulted in the RFC determination.  In Polaski v. Heckler, 739 F.2d 1320, 1322, the Eighth Circuit held that when evaluating a plaintiff's subjective complaints of pain, the ALJ "must give full consideration to all of the evidence presented" such as "the claimant's daily activities; the duration, frequency, and intensity of the pain, precipitating and aggravating factors, dosage, effectiveness and side effects of medication, [and] functional restrictions."  When "inconsistencies in the evidence as a whole" exist, the ALJ may discount subjective complaints.  Id.  Thus, the ALJ may consider a claimant's daily activities when evaluating Plaintiff's subjective complaints.  If the ALJ had based his determination solely on Plaintiff's daily activities, it would provide a stronger ground for objection; however, the record here demonstrates that such is not the case now before the Court. The ALJ, under Polaski, appropriately considered Plaintiff's daily activities and the effectiveness of medication, among the other Polaski factors.  The Court has taken into account the evidence in the record that fairly detracts from the ALJ's findings.  However, the Court finds that substantial evidence in the record as a whole supports the ALJ's determination of Plaintiff's residual functional capacity.

**B.  Whether the State Agency Physician was Required to Physically Examine Plaintiff Before Opining on Plaintiff's Disability.**

Whether a state agency physician must physically examine a claimant before providing an opinion regarding the claimant's disability presents an entirely legal issue.  Plaintiff argues that "someone should not be able to make life changing decisions based on medical records alone."  (Mot. for Summ. J. [Docket No. 11] at 2).  Plaintiff provides no support for her legal argument and the regulations clearly discredit Plaintiff's argument.

The regulation regarding evaluating opinion evidence provides that although generally more weight is afforded to the opinion of a source who has physically examined the claimant, it is appropriate to consider the opinion of someone who has not examined the claimant.  See 20 C.F.R. § 404.1527(d)(1) ("Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); 20 C.F.R. § 404.1527(f) ("Opinions of nonexamining sources. We consider all evidence from nonexamining sources to be opinion evidence.").  More specifically, the ALJ may consider medical opinions given by state agency medical or psychological consultants.  See 20 C.F.R. § 404.1527(f)(1)-(3).  Such consultants are considered "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i).  Thus, the issue of whether the ALJ may consider a nonexamining opinion is simply an issue of how much weight the opinion will be afforded:

> Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. § 404.1527(d)(3).

Additionally, although the ALJ "draws from medical sources for support" in making his RFC assessment, the assessment is "ultimately an administrative determination reserved to the Commissioner." Cox v. Astrue, 495 F.3d 614, 619-20 (8th Cir. 2007). In each case, the ALJ thoroughly reviews the entirety of the medical record, weighs the competing evidence, and bases his resolution of the medical opinions on substantial evidence on the record as a whole. For these reasons, the Court finds that the state agency medical consultant was not required to personally examine Plaintiff first-hand before rending his medical opinion.

**C. Whether the ALJ Appropriately Determined that Plaintiff Could Perform her Past Relevant Work**

The ALJ determined that Plaintiff "is capable of performing past relevant work as a cafeteria manager and cash office manager" because such "work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. 15). The ALJ reached this conclusion on the basis of the vocational expert's testimony that both of Plaintiff's past jobs are "in the light exertional category and skilled positions." (Tr. 15). Plaintiff asserts that the expert's opinion is erroneous because both of her prior positions were "**very** exertional and stressful." (Tr. 92) (emphasis in original).

The Court first notes that in making her claim, Plaintiff referenced no specific evidence in the record to demonstrate the level of exertion in her previous jobs that would contradict or conflict with the vocational expert's opinion. However, even if she were able to offer such evidence, specifically as to the stress and exertion she experienced at her previous employment, the determination of the type of job Plaintiff is capable of performing may be based on general industry standards as guided by the Dictionary of Occupational Titles (DOT). See 20 C.F.R. § 404.1560(b)(2) ("We may use the services of vocational experts or vocational specialists, or

other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and

supplements, published by the Department of Labor, to obtain evidence we need to help us

determine whether you can do your past relevant work, given your residual functional capacity.

A vocational expert or specialist may offer relevant evidence within his or her expertise or

knowledge concerning the physical and mental demands of a claimant's past relevant work,

either as the claimant actually performed it **or** as generally performed in the national economy.").

In determining that Plaintiff could return to her past relevant work, the ALJ is not necessarily

making a conclusion that Plaintiff can return to her previous position specifically, but rather to a

position with similar responsibility.  Indeed, the Eighth Circuit has explicitly rejected Plaintiff's

argument that it may only be relevant work as she "in fact performed it in the past."  Martin v.

Sullivan, 901 F.2d 650, 652-53 (8th Cir. 1990) (explaining that the test under the statute is

"clearly meant to be disjunctive" and "[i]f the claimant is found to satisfy either test, then a

finding of not disabled is appropriate").  In his written vocational analysis, the expert provided

the DOT No. 187.167-106 for Plaintiff's position as a cafeteria manager and DOT No. 185.167-

046 for Plaintiff's position as a cash office manager.  He listed the exertional level for both

positions as "light."  "Testimony from a vocational expert based on a properly-phrased

hypothetical constitutes substantial evidence."  Howard v. Massanari, 255 F.3d 577, 582 (8th

Cir. 2001).  Here, Plaintiff does not challenge the hypothetical question posed to the vocational

expert.  For these reasons, the Court finds that the ALJ's finding is supported by substantial

evidence in the record as a whole.

    **D.  Whether the Court Should Remand the Case in Light of the Newly Submitted**
        **Medical Evidence**

The newly submitted medical evidence falls in two distinct categories:  (1) the evidence submitted to the Appeals Council—the treatment notes from March 30, 2008 to October 30, 2008—and (2) the evidence submitted directly to this Court—the two letters from physicians who have recently treated Plaintiff.  Each category is reviewed under a different standard.

The first category presents the Court with the "peculiar task" of "speculat[ing] to some extent on how the administrative law judge would have weighed the newly submitted [medical records] if they had been available for the original hearing."  Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).  In Riley, the Eighth Circuit explained that "[o]nce it is clear that the Appeals Council has considered newly submitted evidence, [the Court does] not evaluate the Appeals Council's decision to deny review[, rather the Court's] role is limited to deciding whether the administrative law judge's determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."  Id.  Though the Appeals Council did not provide detailed reasoning, it explicitly stated that it "considered the reasons [Plaintiff] disagree[d] with the decision [of the ALJ] **and** the additional evidence [submitted by Plaintiff]."  (Tr. 1).  The Appeals Council acknowledged that it could review the case if it received "new and material evidence and the decision [of the ALJ] [was] contrary to the weight of all the evidence now in the record" but nevertheless denied review of her case because it found that the newly submitted information did "not provide a basis for changing the Administrative Law Judge's decision."  This Court agrees.[3]

---

[3] The Court also notes the additional requirement that any such evidence must relate to the period before the date of the ALJ's decision.  20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.").  However, because all of the medical records submitted to the Appeals Council were for the time frame before the ALJ issued his decision, even though they were past the ALJ hearing, this requirement appears to be a non-issue.

Plaintiff does not explicitly state why she believes the evidence in the first category undermines the ALJ's decision, but after independently reviewing this evidence, the Court finds that the ALJ's decision is still supported by substantial evidence on the record as a whole.  The first-category evidence submitted by Plaintiff merely demonstrate similar symptoms and similar diagnoses as those considered by the ALJ in Plaintiff's previous medical records.  The records also demonstrate that these conditions were again managed by the same treatment as previously prescribed: medication and an injection.  The only additional significantly different diagnosis was regarding the mass observed in her leg.  However, this was also treated with only medication and suggestions of physical therapy, and the treating physicians specifically stated that surgery was not required.  More importantly, there is nothing in the new medical records to suggest, that the conditions listed in the first-category of new evidence "imposed any limitation on [Plaintiff's] ability to work."  Box v. Shalala, 52 F.3d 168, 172 (8th Cir. 1995).

Regarding the second-category of new evidence—the two letters submitted by more recent treating physicians—the Court applies a different standard.  "If new evidence is presented directly to a reviewing court, the court may remand to the Secretary only if the evidence is material and the claimant shows "good cause for failure to incorporate such evidence into the record in a prior proceeding."  Box, 52 F.3d at 172 (quoting 42 U.S.C. § 405(g)).  "Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision."  Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).  And even if the evidence is material and good cause is shown, the Court is not required to but may remand the case and order that additional evidence be taken.  See 42 U.S.C. § 405(g).  Plaintiff makes no showing of good cause for why she failed to acquire and present these letters to the Appeals Council, even though one of the letters predated the Appeals Council's decision

and the other was dated only a little more than a month after the decision. Regardless, the Court finds that because the letters are not material, a showing of good cause would be immaterial.

First, the Court notes the wholly conclusory nature of both letters. The letters merely provide a cursory statement of her conditions (which were diagnosed even in the previously submitted record) and offer no explanation for how the physicians came to their diagnosis of these conditions. Second, the Court is reluctant to label these letters as opinions because they offer no assessment on Plaintiffs limitations or her ability to work; they provide little more than simply an incomplete list of her conditions. And in that regard, they do not "indicate a substantial impairment during the time period relevant to this case," other than what was already in the record. Thornhill v. Chater, 56 F.3d 69, 1995 WL 315095, at *1 (8th Cir. 1995) (unpublished decision). Finally, and more importantly, neither of the letters provides that these statements are related to her medical conditions "on or before the date of the ALJ's decision." The letters were written in August of 2010 and January of 2011, respectively almost and more than two years after the ALJ's decision issued. Dr. Bosacker stated that Plaintiff "is **currently** not working" and "**currently** is limited with the physical activity she can perform." Similarly, Dr. Tierney explicitly provided that Plaintiff was "a patient [he had] recently seen" and offered no information that his letter was in reference to Plaintiff's conditions or impairments for the period prior to the ALJ's decision. For these reasons, the Court finds that it is inappropriate to remand this case to consider this additional evidence with respect to Plaintiff's claim of disability for the period alleged in her application.

## IV.     CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1)  Defendant's Motion for Summary Judgment [Docket No. 16] be **GRANTED**; and

2)  Plaintiff's Motion for Summary Judgment [Docket No. 11] be **DENIED**.


Dated: January 30, 2012                          s/ Leo I. Brisbois_____
                                                 LEO I. BRISBOIS
                                                 United States Magistrate Judge

# N O T I C E

        Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by February 13, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.